**Opinion issued September 16, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-25-00201-CV**

————————————

## IN THE INTEREST OF B.A. A/K/A B.L.A., A CHILD

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2023-01243J

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's

order, entered after a bench trial, terminating her parental rights to her minor child,

B.A., also known as B.L.A., and awarding appellee, the Department of Family and

---

[1]    *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

Protective Services ("DFPS"), sole managing conservatorship of B.A.[2] In four issues, mother contends that the trial court erred in appointing DFPS as the sole managing conservator of B.A. and the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed B.A. to remain, in conditions or surroundings which endangered his physical or emotional well-being,[3] she failed to comply with a court order that specifically established the actions necessary for her to obtain the return of B.A.,[4] and termination of her parental rights was in the best interest of B.A.[5]

We affirm.

## Background

DFPS filed a petition seeking termination of mother's parental rights to B.A. and managing conservatorship of B.A.

### *Removal Affidavit*

At trial, the trial court admitted into evidence a copy of the affidavit of DFPS investigator Brandii Whitley. Whitley testified that on May 22, 2023, DFPS received a referral alleging physical abuse of B.A., a two year old, by mother and

---

[2] The trial court also terminated the parental rights of B.A.'s alleged father, but he is not a party to this appeal.

[3] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

[4] *See id.* § 161.001(b)(1)(O).

[5] *See id.* § 161.001(b)(2).

mother's boyfriend, Adrien Thomas. According to the referral, Thomas hit B.A. with a belt on his back, and "some of the hits had broken [B.A.'s] skin." B.A. had "bruising under [his] eyes," "several bumps on his head," "multiple scratches," and a "busted lip from being punched" by Thomas. B.A. "hyperventilated and passed out due to being scared." After emergency medical services ("EMS") was called, mother rode in the ambulance with B.A., who was admitted into the pediatric intensive care unit at the hospital. B.A. was unconscious, had "a traumatic subdural hemorrhage," "multiple bruises," and "healing fractures of his ribs."

According to Whitley, mother had changed her "story about what happened" to B.A., but she was aware of the physical abuse.[6] She reported that B.A. had fallen on the floor several days before and "that [was] why [B.A.] ha[d] a traumatic subdural hemorrhage." DFPS was concerned that mother was not protecting B.A. Whitley explained that mother had been allowing Thomas to supervise B.A. for a year, and "[w]hen asked what she planned on doing with" Thomas, mother "did not respond." Thomas was arrested for the felony offense of injury to a child.[7]

---

[6] A social worker with the hospital told Whitley that "mother's story was inconsistent." The social worker was concerned that Thomas had been physically abusing B.A. and that "mother [did not] seem concerned about what was going on with" the child.

[7] A copy of an indictment, charging Thomas with the felony offense of injury to a child, was admitted into evidence. It alleged that "on or about May 22, 2023," Thomas "intentionally and knowingly cause[d] serious bodily injury to" B.A., the complainant, "a child younger than fifteen years of age, by striking" B.A. "with an unknown object."

When Whitley observed B.A. in the hospital, she saw marks and bruises on his body. He had several marks and bruises on his face, neck, back, and hips. There were signs "showing that the child had been abused prior to [DFPS's] involvement."[8] A physician at the hospital told Whitley that B.A. "had bleeding on the front[] of the brain" and would require follow-up appointments. It appeared that B.A. "ha[d] been [physically] abused over a long period of time," and Whitley was concerned that mother was unable to protect B.A. because mother had admitted to seeing Thomas hit B.A. across the back with a belt on multiple occasions. B.A.'s fractured rib injury was healing, but it had never been treated medically.

After speaking with mother, Whitley learned that she had been living with Thomas, her boyfriend, for about eight months. B.A.'s father was not involved in his life, and mother did not speak to him. Mother denied using narcotics and stated that her relationship did not involve domestic violence.

While discussing how B.A. had been injured, mother told Whitley that she had been at work "when she received a call through social media" from Thomas. Thomas "told her that [B.A.] had passed out and . . . she needed to come home." As she spoke with Thomas, she could hear other people in the background calling for emergency assistance. When mother arrived home, B.A. was in the ambulance, and

---

[8]     The trial court admitted into evidence photographs of B.A.'s injuries that were taken at the hospital by Whitley.

4

EMS personnel told her that B.A. was unconscious. At the hospital, mother was told that B.A. had "bleeding on the brain due to an injury." As to the bruises on B.A., mother stated that Thomas spanked the child on his back and that had caused the bruises.[9] Mother reported that other bruising was caused by "falling," and she was "not aware of the healing fractures on [B.A.'s] ribs and hips."

### DFPS Caseworker Vidal

Daisy Vidal testified that she was the DFPS caseworker assigned to B.A.'s case. B.A. entered DFPS's care on May 22, 2023 after he sustained certain injuries. According to Vidal, the bruises on B.A.'s body were in different stages of healing, and based on B.A.'s medical records, mother should have known that B.A. was being injured by Thomas over a period of time.

As to mother, Vidal testified that at the time B.A. entered DFPS's care, mother was living with Thomas. After Thomas was arrested on criminal charges related to B.A.'s injuries, mother "bonded [him] out." Thomas provided mother's address and telephone number as his contact information. Vidal was concerned that mother had left Thomas to care for B.A. on the day he was injured.

Vidal also testified that mother received a Family Service Plan ("FSP"), which she had not completed. Mother had not established stable housing as required by

---

[9]     Mother acknowledged that Thomas would spank B.A., who was two years old at the time, if he urinated on himself.

her FSP[10] and had not completed the required parenting classes. Mother had also failed to complete a domestic violence assessment and individual therapy.[11] Mother had not attended all hearings during the case, and she had missed visits with B.A. Mother was employed at the time of trial, and the visits she had with B.A. during the case were appropriate. Notably, in November 2023, the trial court ordered mother's visits with B.A. stopped because mother had not begun working on her FSP and her visits with B.A. until then had been sporadic. According to Vidal, mother would cancel her visits with B.A. "last minute" and she was acting inconsistent. In October 2024, mother asked Vidal if she could resume visits with B.A., but the court order was still in place and mother had not filed anything with the trial court. Vidal believed that mother wanted to have a relationship with B.A. Vidal estimated that mother had visited B.A. five or six times during the entire case.

Vidal further explained that during the pendency of the case, mother tested positive for narcotics use in December 2023 and on March 28, 2024 and June 25, 2024. Mother also failed to attend her required narcotics-use testing multiple

---

[10]     Vidal noted that mother, at the time of trial, lived with a new boyfriend, and she had not obtained "housing of her own."

[11]     Vidal explained that mother had completed a psychosocial assessment and a psychological assessment, and mother started individual therapy a month or two before trial, but she had not completed it.

times—including in January and February 2024. Mother tested negative for narcotics use in April, May, July, August, September, and October 2024.[12]

According to Vidal, B.A. was currently living in an adoptive placement with foster parents who were interested in adopting him. B.A. had been living with his foster parents for most of the case, and he was doing well in his placement; he was bonded with his foster parents. He referred to his foster parents as "Mom" and "Dad," and he was bonded with his foster siblings.

Vidal described B.A.'s current placement as stable and noted that his foster parents were meeting his needs. B.A. had recovered from the injuries he sustained before he entered DFPS's care, and his foster parents ensured that he received play therapy, occupational therapy, physical therapy, and speech therapy twice a week in their home. B.A. also attended school. In Vidal's opinion, B.A.'s foster parents were attentive to him and showed him affection. His current environment was safe. Stability and permanency were in B.A.'s best interest.

---

[12] The trial court admitted into evidence copies of mother's narcotics-use-testing results. The results showed that on December 6, 2023, mother tested positive for cocaine, marijuana, opiates, and alcohol; on March 28, 2024, mother tested positive for cocaine, marijuana, and alcohol; and on June 25, 2024, mother tested positive for cocaine and marijuana. On April 11, 2024, May 13, 2024, May 31, 2024, June 10, 2024, July 15, 2024, and August 1, 2024, mother tested negative for narcotics use.

### *Child Advocates Representative Warren*

Child Advocates, Inc. ("Child Advocates") representative Cassandra Warren testified that she had been assigned to B.A.'s case. It was her recommendation that mother's parental rights be terminated and DFPS be designated as B.A.'s permanent managing conservator. In her opinion, doing so was in the best interest of B.A. because it would provide him with stability.

As to why mother's parental rights should be terminated, Warren explained that mother had not completed her FSP, had tested positive for narcotics use during the pendency of the case, and did not have stable housing at the time of trial. Further, B.A. had certain medical and therapeutic needs that were being addressed by his current placement, but Warren was concerned that mother could not care for the child's special needs. For instance, B.A. had issues with his speech, and there were concerns about his hearing. He also had certain educational needs. Warren noted that mother did appear to want a relationship with B.A., but she was concerned that mother had not visited with B.A. much during the case and had missed certain visits with the child.

Warren further testified that B.A.'s current adoptive placement was organized and structured. B.A.'s foster parents provided for his needs. B.A. was bonded with his foster siblings. He participated in kid-appropriate activities, such as attending birthday parties and going to bounce houses. His foster parents were loving and

affectionate with him, and they paid attention to his needs. They wanted to adopt B.A.

### *Child Advocates Representative Chevalier*

Child Advocates representative Nay Chevalier testified that she was assigned to B.A.'s case in July 2023. Initially, mother lived in her own apartment, but due to a fire, she had to move out. Since that time, mother had not had a stable home.

As to B.A., Chevalier stated that he was currently placed in a foster home. He first lived in the foster home from July 2023 to November 2023. In November, B.A. was then placed with one of mother's relatives for a period of time. He returned to his current foster home in July 2024 after mother's relative was no longer able to care for him. When B.A. returned to his current placement, he was excited to be there; "[h]e just kind of resumed where he had left off." And he "verbalized that he was home." According to Chevalier, B.A.'s current placement was a stable home and B.A. was thriving there. He referred to his foster mother as "Mom." B.A.'s foster parents wanted to adopt him, and Chevalier believed that permanency for B.A. was important.

Chevalier recommended that the trial court terminate mother's parental rights and B.A. remain in his current placement. She believed that termination of mother's parental rights was appropriate because mother could not provide a stable home for B.A. and she lacked familial support to help her care for B.A. Mother had told

9

Chevalier in the past that she "had no one" supporting her. Mother had also missed numerous visits with B.A. during the pendency of the case. Chevalier was further concerned about mother's ability to provide for B.A.'s medical needs.

### Child Advocates Report

The trial court admitted into evidence a copy of a report prepared by Chevalier for an August 15, 2024 hearing in the trial court. The report recommended that mother's parental rights be terminated because of B.A.'s vulnerable age and mother's inadequate "social support system." According to Chevalier, because B.A. was a young child, he was "unable to speak up for himself or determine proper and improper care and supervision." Further, mother had told Chevalier that her cousin was the only support system she had, and mother's cousin had expressed that she was unable to help care for B.A.

As to mother's FSP, the Child Advocates report stated that mother did not have her own housing and was "residing with someone else." She worked at a restaurant and had completed her psychosocial assessment. Mother was "working towards completing [her] parenting classes," but she had not done so yet. Mother had also not completed "the domestic violence requirements" of her FSP because she did not "feel that she need[ed] them." Mother had no criminal history, but she had tested positive for narcotics use during the case.

10

As to B.A.'s current placement, the report explained that he was thriving, "current on shots," and receiving occupational, physical, speech, and play therapy. In August 2024, B.A. would begin attending school. B.A. appeared to have adjusted well to his placement, and he had "expressed his desire to be in his current placement." B.A. had three foster siblings and shared a room with his foster brother. B.A. had his own bed.

### Mother

Mother testified that she was B.A.'s mother. B.A. was two years old when he entered DFPS's care in May 2023. At the time of trial, he was four years old. B.A.'s father had never seen the child.

Mother explained that she was previously in a dating relationship with Thomas. In November 2022, mother and B.A. began living with Thomas, after mother met him in July 2022. Mother did not have concerns about Thomas being around B.A. At the beginning, Thomas worked during the day, and mother worked at night, so each took care of B.A. while the other adult was at work. At the end of December 2022, however, Thomas stopped working, and mother became the sole provider for the household. Thomas continued to watch B.A. while mother was at work.

According to mother, while B.A. was in her care, to discipline him, B.A. "would get a small pat on the hand or he would sit on the potty for 10 or 15 minutes depending on if he used the bathroom or not." She did not spank B.A.

Mother further testified that one day, in May 2023, she was working when she received a telephone call that B.A. had been injured. Mother immediately left work, and when she arrived home, an ambulance was there. B.A. was "awake and scared." Mother noticed that B.A. had "marks . . . everywhere."[13] Mother rode with B.A. in the ambulance to the hospital, where he stayed for three days before he was released into DFPS's care.

As to B.A.'s injuries, mother acknowledged that B.A. had a "busted" lip. She told hospital personnel that the day before, B.A. had fallen "face first" and "his teeth went into his lip" while he was playing with his cousins. At trial, mother stated that B.A. had internal bleeding in his head because he had fallen on a LEGO brick on the hard wood floor. And the bruising under B.A.'s eyes was because B.A. had been "drinking from a cup that had a straw in it[,] and he put it down and he was running around and then fell on the straw."

---

[13] Mother noted that a few days prior, B.A. had fallen and sustained some bruises.

Mother acknowledged that B.A. had a fractured rib and had markings on his back when he arrived at the hospital, which she believed had come from a belt.[14] Although mother had never spanked B.A. with a belt, she knew that Thomas had done so. She did not know how many times that Thomas had spanked B.A. with a belt, but she had seen him do so once about a month before B.A. was removed from her care. She had not been concerned about Thomas spanking B.A. with a belt, and she felt that it was an appropriate form of discipline. But the markings on B.A.'s back concerned her, and she became concerned about Thomas's ability to care for B.A. On the day that B.A. went to the hospital, she believed that Thomas had physically abused B.A. while she was not around; she had not thought Thomas was physically abusing B.A. before that day. At the time of trial, mother believed that B.A. had been physically abused by Thomas.

Mother further testified that Thomas was arrested after B.A. was taken to the hospital, and she ended her relationship with him. Thomas had not moved back in with her, and she had not seen him since that day in May 2023.[15] She felt hurt, betrayed, and disappointed with Thomas's actions. If she had known that Thomas

---

[14] According to mother, B.A. did not have markings on his back before the day he went to the hospital.

[15] Mother testified that Thomas had called her while she was at the hospital with B.A. and told her that B.A. had "passed out," but he did not mention the bruising.

13

was mistreating B.A., she would not have left B.A. in Thomas's care. B.A. had not appeared to be afraid of Thomas while Thomas lived with her and B.A.

Mother also explained that after B.A. entered DFPS's care, in August 2023, she received her FSP. She completed a psychosocial assessment in September 2023, and from September 2023 through December 2023, mother had visits with B.A.[16] In December 2023, mother began participating in narcotics-use testing.

In January 2024, mother got a job at a restaurant, where she still worked at the time of trial. In April 2024, mother participated in parenting classes, but after she took those classes, DFPS told her that it "wasn't what they wanted." Mother also continued to participate in narcotics-use testing in 2024, and at the time of trial, she was not using narcotics.[17] In July 2024, mother completed a substance abuse assessment. In August 2024, she attended domestic violence classes, but she was told by DFPS that she had not attended the "correct class." In October 2024, mother began attending individual therapy twice a week.

---

[16] Mother noted that her visits with B.A. were stopped during the case because she had missed certain visits with the child. Mother acknowledged that she had missed multiple visits but stated that it was because she "had no phone and no money." Mother explained that she had asked to start having visits with B.A. again, but she acknowledged that there was a court order preventing her from doing so. The last time that mother had a visit with B.A. was in April 2024.

[17] Mother admitted to using marijuana in the past but denied using cocaine. She did not know why she tested positive for cocaine use during the case.

At the time of trial, mother lived with her new boyfriend, but she planned to "find [her] own housing." Mother had been living with her boyfriend for about five months, but she agreed that she did not have "stable housing." Mother planned to move out of her boyfriend's home within the next six months.

As for her support system, mother stated that she relied on her cousins, grandmother, stepmother, and her parents. If she needed help with B.A., she could ask her family for help. If B.A. were returned to her care, mother planned to enroll him in daycare and "make sure that [she] ha[d] a better safety plan." Mother also planned to continue going to therapy. Mother acknowledged that she was not prepared for B.A. to be immediately returned to her care, but she stated that she did not want her parental rights terminated and wanted more time to work on her FSP.

### *Mother's FSP*

The trial court admitted into evidence a copy of mother's FSP dated July 18, 2023. The FSP listed "[f]amily [r]eunification" as DFPS's primary permanency goal and "DFPS [c]onservatorship" as a concurrent permanency goal. As to "hopes and dreams" for B.A., the FSP stated that mother hoped that B.A. would be returned to her care.

As to B.A., the FSP explained that when B.A. entered DFPS's care, he had a speech delay and was "developmentally delayed." B.A. required speech and occupational therapy and medical follow-up appointments. Because of his speech

delay, B.A. was "not able to verbally express his wants and wishes." B.A. was adjusting well to his placement with his foster family.

The FSP noted that DFPS was concerned about mother's "ability to protect [B.A.] from future abuse or neglect" and keep him away "from people who may inflict serious harm" because B.A. was young and vulnerable. DFPS was also concerned with mother's lack of a support system and her ability to provide for B.A.'s basic needs and supervision.

Mother acknowledged that B.A. was not current on his vaccinations while in her care because she did not have time to get them. B.A. also did not "receiv[e] services for his speech delay" while living with mother, and he had "tantrums and would hit his head on the floor." Mother would "slap [B.A.'s] hand or butt when disciplining" him.

Mother's FSP required her to, among other things, acquire and maintain stable housing throughout the pendency of the case. Mother's housing needed to be safe, clean, and free of hazards to ensure B.A.'s well-being. Mother was also required to maintain legal and verifiable employment and attend and complete parenting classes.[18] The FSP required mother to complete a domestic violence assessment and follow its recommendations; complete a substance abuse assessment and follow its

---

[18] The FSP noted that online parenting classes were not acceptable.

recommendations; participate in narcotics-use testing throughout the case;[19] complete a psychosocial assessment and follow all recommendations; complete a psychological evaluation to assess her emotional and mental health and follow all recommendations; attend all court hearings, permanency conferences, family visits, and scheduled case-related appointments; and refrain from all criminal activity or interacting with anyone involved in criminal activity.[20]

### Mother's Psychosocial Assessment

The trial court admitted into evidence a copy of mother's psychosocial assessment completed on October 26, 2023. During her interview for the assessment, mother reported that she did not think that Thomas had hurt B.A. Instead, she believed that B.A.'s "brain bleed was caused by him 'hitting his head hard' on the wood floor after tripping over a Lego [brick]." Mother was not sure how the injuries that were observed on B.A. at the hospital had occurred, and she did not "want to accuse anyone."

---

[19] The FSP informed mother that if she missed a narcotics-use test, it would be considered a positive test result.

[20] The trial court signed an order on August 1, 2023, a copy of which the trial court admitted into evidence, finding that mother had reviewed and understood her FSP and had been "advised that unless she [was] willing and able to provide [B.A.] with a safe environment, even with the assistance of [her FSP], within a reasonable period of time specified in the [FSP], her parental and custodial duties and rights [were] subject to restriction or termination or [B.A. would] not be returned to her." The trial court also found that mother had signed the FSP and ordered mother to complete her FSP.

Mother told her interviewer that she met Thomas when she was twenty-one years old, and he was twenty-three years old. They were in a relationship for one-and-a-half years, and they lived together for six months. Mother denied that there was domestic violence in their dating relationship. Mother explained that she and Thomas were no longer in a relationship because she did not want to lose custody of B.A.

Mother further reported that at the time of the interview, she was living in an apartment, and she was responsible for paying the rent. Previously, Thomas lived with her at the apartment, but after his arrest, she lived there alone. Before living in the apartment, mother lived with her paternal grandmother.

At the time of the interview, mother had a job, and she worked between twenty-eight to forty hours a week. Mother received food stamps to help provide for herself and B.A. when he was in her care. Mother did not have her own transportation and relied on public transportation or "Lyft." B.A.'s father did not pay child support.

While B.A. was in her care, mother disciplined him by slapping him on the hand, putting him in time out, or not allowing him to watch television. Mother believed that she could manage B.A.'s behavior. Mother stated that she had not seen Thomas "be[] rough" with B.A., but she knew Thomas would spank B.A. on his

bottom with his hand. Mother denied that either she or Thomas ever "left any marks on [B.A.] from disciplin[ing]" him.

Mother reported that B.A. started crawling around six months old and began walking at one year old. DFPS had determined that B.A. had a speech delay, but mother was not concerned because she could understand B.A. Mother described B.A. as "a pretty curious kid, always looking around, [not] want[ing] to sleep because he's afraid he w[ould] miss something." (Internal quotations omitted.) B.A. liked to play with LEGO bricks, play outside, and watch a television show called "Blues Clues." Mother stated that she and B.A. had a strong bond.

Mother's psychosocial assessment concluded that mother could "benefit from learning about effective parenting techniques, how to create structure for her child, along with [providing] appropriate supervision/caregivers for her child." Thus, it recommended that mother participate in and complete parenting classes.

The assessment also concluded that there were concerns with mother's "ability to provide safety and protection for her young and vulnerable child" because although mother reported that she ended her relationship with Thomas, she "d[id] not believe he physically abused [B.A.]." Thus, the assessment recommended that mother engage in individual therapy.[21]

---

[21] According to the assessment, mother needed to address "[h]er role and responsibility in the current DFPS case." Mother also should "[c]onfront her denial about [B.A.'s] injuries" and "how she and [B.A.] ha[d] been affected by her lack of

Because mother, during her interview, had admitted to using marijuana in the past, the assessment also recommended that mother participate in narcotics-use testing to confirm that she was not using narcotics. If mother's first narcotics-use test was positive, mother needed to complete a substance abuse assessment and follow its recommendations.

Finally, the assessment commended mother on having stable employment and income. It noted that mother had graduated high school and intended on attending cosmetology school. It recommended that mother continue to maintain stable employment and income sufficient to care for herself and B.A. and stated that mother should maintain safe, stable, narcotics-free housing.

*Permanency Report*

The trial court admitted into evidence a copy of a permanency report dated July 29, 2024. The permanency report stated that B.A. was four years old and enjoyed playing with toy trucks, watching cartoons, playing outside, and being active. He was living in a foster home, and he was well-adjusted. B.A. would start pre-kindergarten in August 2024. B.A. participated in speech therapy, occupational therapy, and play therapy. B.A.'s foster parents wanted to adopt him.

---

judgment about partner choices." Further, mother needed guidance to understand "[h]ow to use good judgment about future partner choices" and "healthy versus unhealthy relationships."

As to his medical needs, the permanency report explained that while living with his foster parents, B.A. had medical checkups and visited the dentist. He would soon be due for his four-year-old well-child exam and another visit to the dentist. He had been diagnosed with sleep apnea and was scheduled to have his tonsils removed in September 2024.

As to mother's progress during the pendency of the case, the permanency report explained that she had minimal communication with the DFPS caseworker, and she had not secured stable housing. According to mother, she "reside[d] with family/friends." In July 2024, it was unknown whether mother was employed; she had provided two paystubs in March 2024 which showed that she worked at a restaurant. Mother had not completed her required parenting classes and had not completed a domestic violence assessment or a psychological evaluation. Mother had also not completed her substance abuse assessment and had tested positive for narcotics use on December 6, 2023, March 28, 2024, and June 25, 2024. Mother did not show up for her required narcotics-use tests in January and February 2024. On April 11, 2024, May 13, 2024, May 31, 2024, June 10, 2024, and July 15, 2024, mother tested negative for narcotics use.

Finally, the permanency report noted that although mother had completed a psychosocial assessment in October 2023, she had not completed its recommendations, which included completing parenting classes and participating in

21

individual therapy. Further, while the case was pending, mother had failed to attend a permanency conference, court hearings, and certain visits with B.A.

## Termination of Mother's Parental Rights

In her first and third issues, mother argues that the trial court erred in terminating her parental rights to B.A. because the evidence is legally and factually insufficient to support the trial court's finding that she knowingly placed, or knowingly allowed B.A. to remain, in conditions or surroundings which endangered his physical or emotional well-being and termination of her parental rights was in the best interest of B.A. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (b)(2).

A parent's right to "the companionship, care, custody, and management" of her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary

termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In*

*re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment for the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *See id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A. Endangerment

In her first issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that she knowingly placed, or knowingly allowed B.A. to remain, in conditions or surroundings which endangered his physical or emotional well-being because there was "scant evidence in the record regarding the physical condition on [mother's] home prior to removal," mother testified that "she did not notice any marks on [B.A.] in the weeks leading up to his removal," and DFPS did not present "a medical expert on the etiology of [B.A.'s] physical injuries." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

25

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that a parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger[ed] [his] physical or emotional well-being." *Id.* To "endanger" means to expose the child to loss or injury or to jeopardize his emotional or physical health. *Boyd*, 727 S.W.2d at 533 (internal quotations omitted); *see also Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Fam. & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. However, it is not necessary that the endangering conduct be directed at the child or that the child actually suffer injury. *Id.*

Texas Family Code section 161.001(b)(1)(D) focuses on the child's surroundings and environment and requires a showing that the environment in which the child was placed endangered his physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regul. Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied); *see also In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth

26

2009, no pet.); *In re S.M.L.*, 171 S.W.3d at 477. "Environment" refers to the acceptability of the child's living conditions as well as the conduct of a parent or other person in the home because the conduct of a parent or other person can create an environment that endangers the child's physical or emotional well-being. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (internal quotations omitted); *see also In re I.L.L.*, No. 14-09-00693-CV, 2010 WL 4217083, at *6 (Tex. App.—Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem. op.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) ("It is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, are not inherently a part of the 'conditions and surroundings' of th[e] . . . home . . . ."). For instance, inappropriate, unlawful, abusive, or violent conduct by a parent or other person living in the child's home is a part of the "conditions or surroundings" of the child's home and may produce an environment that endangers his physical or emotional well-being. *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *12 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) (internal quotations omitted); *In re M.R.J.M.*, 280 S.W.3d at 502 (internal quotations omitted); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Thus, although Texas Family Code section 161.001(b)(1)(D) focuses on the child's living environment, conduct of a parent or

27

other person in the home may produce an endangering environment. *See In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at \*12 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.).

The relevant time frame for establishing that a parent knowingly placed, or allowed her child to remain, in conditions or surroundings which endangered his physical or emotional well-being is before the child's removal. *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied); *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). A fact finder may infer from a parent's past conduct endangering the well-being of the child that similar conduct will recur in the future. *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.); *see also In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.) (trier of fact may measure parent's future conduct by his past conduct). DFPS does not need to establish that a parent intended to endanger the child for parental rights to be terminated based on endangerment. *In re J.H.*, 2023 WL 2169952, at \*13. Texas Family Code section 161.001(b)(1)(D) permits termination based on a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

It is undisputed that before B.A. was removed from mother's care, mother's then-boyfriend, Thomas, lived with her and B.A. Further, it is undisputed that

mother allowed Thomas to supervise and care for B.A. while she was at work, and she had been doing so for an extended period of time.

As to the incident that prompted B.A.'s removal from mother's care, the record shows that, in May 2023, while working, mother "received a call through social media" from Thomas, who "told her that [B.A.] had passed out and . . . she needed to come home." When mother arrived home, B.A. was in an ambulance, and EMS personnel told her that he was unconscious. Apparently, B.A. had "hyperventilated and passed out due to being scared" of Thomas. When mother saw B.A., she noted that he had "marks . . . everywhere." B.A. was taken to the hospital and admitted to the pediatric intensive care unit.

While B.A. was at the hospital, signs that he "ha[d] been [physically] abused over a long period of time" were observed. B.A. had marks and bruises on his body, including on his face, neck, back, and hips. The bruises on B.A. were in different stages of healing, indicating that they were not all the result of the same incident. B.A. had "bruising under [his] eyes," "several bumps on his head," "multiple scratches," and a "busted lip from being punched" by Thomas. B.A. also had a fractured rib injury that was in a stage of healing, but it had never been medically treated. And B.A. had suffered "a traumatic subdural hemorrhage."[22]

---

[22] Mother stated that she believed that B.A.'s "brain bleed was caused by him 'hitting his head hard' on the wood floor after tripping over a Lego [brick]." A social worker with the hospital described "mother's story" as "inconsistent."

29

Mother admitted that she had seen Thomas hit B.A. across the back with a belt on multiple occasions, and she stated that Thomas had, in the past, spanked or hit B.A. if he urinated on himself. Mother believed that the markings on B.A.'s back, which were observed when he was admitted to the hospital, were from a belt, which she knew Thomas had been using to hit B.A. Mother, at the time, felt that Thomas spanking B.A. with a belt was an appropriate form of discipline.

At trial, mother acknowledged that the evidence showed that Thomas had been physically abusing B.A. before B.A. entered DFPS's care, but at the time, she had not thought that Thomas was doing so. Instead, back in 2023, mother expressed that she was not sure how B.A.'s injuries had occurred, and she was reluctant to acknowledge that they had been caused by Thomas. DFPS caseworker Vidal opined that, based on B.A.'s medical records, mother should have known that B.A. was being injured by Thomas. Thomas was arrested for the offense of injury to a child related to the injuries observed on B.A. in May 2023.[23]

As previously noted, abusive and violent conduct by a person in a child's home may produce an environment that endangers the physical and emotional well-being of the child. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana

---

[23] The indictment, which charged Thomas with the felony offense of injury to a child, alleged that "on or about May 22, 2023," Thomas "intentionally and knowingly cause[d] serious bodily injury to" B.A., the complainant, "a child younger than fifteen years of age, by striking" B.A. "with an unknown object."

30

2015, no pet.); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re S.R.*, 452 S.W.3d at 360 ("[e]nvironment" refers not only to acceptability of living conditions, but also to person's conduct in home (internal quotations omitted)). Domestic violence, want of self-control, and a propensity for violence may be considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d at 845. Without question, direct physical abuse of a child clearly endangers him. *See In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *8 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.).

Here, there is ample evidence that Thomas, mother's then-boyfriend, physically abused B.A. in the home, and mother knew, at the very least, that Thomas was hitting B.A. This is sufficient to support termination of mother's parental rights under Texas Family Code section 161.001(b)(1)(D). *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *11–13 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (direct physical abuse of child in home by parent's boyfriend supports finding of endangerment and termination of parental rights under Texas Family Code sections 161.001(b)(1)(D) and (E)); *see also In re T.C.*, No. 01-17-00497-CV, 2018 WL 4126600, at *16 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. denied) (mem. op.) ("A parent endangers her child[] by accepting the endangering conduct of other people."); *Jordan*, 325 S.W.3d at 721 ("[A] child is endangered when the environment creates a potential for danger which

31

the parent is aware of but disregards.").  Further, we note that evidence that a parent does not remove her child from or allows her child to remain in a home where there is violent conduct, supports termination of her parental rights.  *See In re L.W.*, 2019 WL 1523124, at *11–13 (evidence parent knows child is being harmed and does nothing supports finding that she knowingly placed, or allowed child to remain, in conditions or surroundings that endangered child's physical or emotional well-being).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed B.A. to remain, in conditions or surroundings which endangered his physical or emotional well-being.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).  And viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed B.A. to remain, in conditions or surroundings which endangered his physical or emotional well-being. *See id.*

Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that mother knowingly placed, or knowingly allowed B.A. to remain, in conditions or surroundings which endangered his physical or emotional well-being. *See id.*  And any disputed evidence was not so significant that

32

a fact finder could not have reasonably formed a firm belief or conviction that mother knowingly placed, or knowingly allowed B.A. to remain, in conditions or surroundings which endangered his physical or emotional well-being. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that mother knowingly placed, or knowingly allowed B.A. to remain, in conditions or surroundings which endangered his physical or emotional well-being. *See id.*

We overrule mother's first issue.

Having held that the evidence is legally and factually sufficient to support the trial court's finding that mother knowingly placed, or knowingly allowed B.A. to remain, in conditions or surroundings which endangered his physical or emotional well-being, we need not address the mother's second issue in which she asserts that the evidence was legally and factually insufficient to support the trial court's findings that she failed to comply with a court order that specifically established the actions necessary for her to obtain the return of B.A. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re A.V.*, 113 S.W.3d at 362 (only one predicate finding under Texas Family Code section 161.001(b)(1) necessary to support judgment of termination); *see also* TEX. R. APP. P. 47.1.

**B.      Best Interest**

In her third issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of B.A. because the "*Holly* [sic] factor[s]" did not weigh in favor of such a finding. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The best-interest analysis evaluates the best interest of the child. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.); *In re D.S.*, 333 S.W.3d at 384. It is presumed that the prompt and permanent placement of a child in a safe environment is in his best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parent. *See In re M.A.A.*, 2021 WL 1134308, at *20; *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In determining whether the termination of mother's parental rights was in the best interest of B.A., we may consider several factors, including: (1) the desires of B.A.; (2) the current and future physical and emotional needs of B.A.; (3) the current and future emotional and physical danger to B.A.; (4) the parental abilities of the

parties seeking custody of B.A.; (5) whether programs are available to assist those parties; (6) plans for B.A. by the parties seeking custody; (7) the stability of the proposed placement for B.A.; (8) mother's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for mother's acts or omissions.[24] *See Holley*, 544 S.W.2d at 371–72; *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

We note that the above listed factors are not exhaustive, and DFPS need not prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.— Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J. G. S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). In some cases, undisputed evidence of only one factor

---

[24] Much of the evidence discussed below applies to multiple factors.

may be sufficient to support a finding that termination is in a child's best interest. *See In re C.H.*, 89 S.W.3d at 27; *see also In re J. G. S.*, 574 S.W.3d at 122.

The same evidence of acts and omissions used to establish grounds for termination under Texas Family Code section 161.001(b)(1) may also be relevant to determining the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1. B.A.'s Desires

When mother's parental rights were terminated, B.A. was four years old. A Child Advocates report admitted into evidence at trial noted that B.A. "expressed his desire to be in his current placement," and Child Advocates representative Chevalier testified that B.A. was excited to be in his current placement and had "verbalized that he was home." *See In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *20 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.) (considering in best-interest analysis that young child had spent majority of life with foster parents).

Yet even without specific evidence of a child's desires, a fact finder may consider evidence that a child is bonded with his foster family and receives good care in his current placement in determining the best interest of the child. *See In re L.W.*, 2019 WL 1523124, at *18. As discussed below, there is ample evidence that B.A. is bonded with his foster parents and siblings, his foster parents are loving toward him, his foster parents are attending to his needs, and his foster parents want to adopt him. *See id.* (in determining evidence sufficient to support best interest finding, considering children bonded with foster family, foster parents wanted children to continue to live with them, and foster parents meeting children's needs); *see also In re L.M.N.*, 2018 WL 5831672, at *20 ("A child's bonding with her foster family implies that the child's desire would be fulfilled by adoption by the foster family.").

### 2.  Current and Future Physical and Emotional Danger

#### a.  *Narcotics Use*

Illegal narcotics use by a parent may constitute evidence of current and future danger to a child. *See In re D.J.G.*, No. 01-22-00870-CV, 2023 WL 3513143, at *23 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet.) (mem. op.); *In re O.J.P.*, No. 01-21-00163-CV, 2021 WL 4269175, at *19–21 (Tex. App.—Houston [1st Dist.] Sept. 21, 2021, no pet.) (mem. op.) (considering evidence of parent's narcotics use in determining current and future danger to child); *see also In re J.O.A.*, 283

S.W.3d 336, 345 (Tex. 2009) (stating "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct"); *In re S.R.H.*, No. 01-15-0714-CV, 2016 WL 430462, at *10–11 (Tex. App.—Houston [1st Dist.] Feb. 4, 2016, no pet.) (mem. op.) (parent's past narcotics use is indicative of instability in home environment); *Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 254–55 (Tex. 2006) (illegal narcotics use while parental rights are in jeopardy may be considered endangering course of conduct critical to finding that termination is in child's best interest).

DFPS caseworker Vidal testified that during the pendency of the case, mother tested positive for narcotics use, and mother did not attend all required narcotics-use testing.[25] *See In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (parent's "refusal to submit to the drug test may be treated by the [fact finder] as if he had tested positive for drugs"); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (fact finder could reasonably infer parent's failure to complete scheduled narcotics-use screenings indicated she avoided testing because she had used narcotics).

---

[25]    Mother's FSP told her that if she missed a required narcotics-use test, it would be considered a positive result. A copy of a permanency report admitted into evidence showed that mother did not show up for her required testing in January and February 2024.

Copies of mother's narcotics-use testing results that were admitted into evidence at trial showed that on December 6, 2023,[26] mother tested positive for cocaine, marijuana, opiates, and alcohol; on March 28, 2024, mother tested positive for cocaine, marijuana, and alcohol; and on June 25, 2024, mother tested positive for cocaine and marijuana. *See In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at *7 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) ("Parental [narcotics] use remains endangering conduct even if the child was not in the parent's custody when the [narcotics] use occurred."). Mother, at trial, admitted to using marijuana in the past, but she denied using cocaine. However, she could not explain why she tested positive for cocaine use. *See In re Z.J.B.*, No. 14-18-00759-CV, 2019 WL 347474, at *7 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, pet. denied) (mem. op.) (parent's positive narcotics-use tests and failure to appear for other narcotics-use tests weighed in favor of trial court's best-interest finding).

We note that mother tested negative for narcotics use on April 11, 2024, May 13, 2024, May 31, 2024, June 10, 2024, July 15, 2024, and August 1, 2024, and according to mother, she was not using narcotics at the time of trial. However, the trial court was not required to "ignore [mother's] history of narcotics use merely because it abate[d] as trial approach[ed]." *In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *9 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied)

---

[26] Mother started participating in narcotics-use testing in December 2023.

(mem. op.); *see also In re D.J.G.*, 2023 WL 3513143, at \*24 ("[E]vidence of a recent improvement does not absolve a parent of a history of narcotics use and irresponsible choices."); *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[E]vidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue.").

        b.    *Physical Abuse*

A child's previous exposure to violence in his home undermines the safety of the home environment and is relevant when considering the child's best interest. *See In re L.W.*, 2019 WL 1523124, at \*19. Further, a parent's inability or unwillingness to protect a child from repeated abuse in the past is a relevant consideration in the best-interest determination. *See id.*; *In re L.M.N.*, 2018 WL 5831672, at \*22. And a parent's past performance as a parent is relevant to a determination of her present and future abilities to provide for her child. *See In re C.H.*, 89 S.W.3d at 28; *In re L.W.*, 2019 WL 1523124, at \*19; *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (trial court may measure parent's future conduct by past conduct); *see also Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

As previously detailed, the record reveals that mother's then-boyfriend, Thomas, physically abused B.A. over an extended period of time, which eventually culminated in B.A. being admitted to the pediatric intensive care unit at the hospital. Before B.A. was admitted to the hospital, mother knew that Thomas had hit B.A. with a belt on previous occasions, and she knew that Thomas had spanked or hit B.A. in the past, including when the then two-year-old child had urinated on himself. *See In re L.W.*, 2019 WL 1523124, at *19 (considering mother knew boyfriend had physically abused her children in holding evidence sufficient to support finding that termination in children's best interest).

Notably, when B.A. was admitted to the hospital in May 2023, he had marks and bruises on his body, including on his face, neck, back, and hips. The bruises on B.A. were in different stages of healing, indicating that they were not all the result of the same incident. B.A. had "bruising under [his] eyes," "several bumps on his head," "multiple scratches," and a "busted lip from being punched" by Thomas. B.A. also had a fractured rib injury that was in a stage of healing, but it had never been medically treated. And B.A. had suffered "a traumatic subdural hemorrhage." Mother provided unlikely explanations for some of B.A.'s injuries. *See* TEX. FAM. CODE ANN. § 263.307(b)(7) (in determining whether parent able to provide child with safe environment, considering history of abusive and assaultive conduct by child's family and others with access to child's home); *see also In re K.S.*, 420

41

S.W.3d 852, 856 (Tex. App.—Texarkana 2014, no pet.) ("[The] past is [a] prologue[;] there is a great likelihood that [a parent's] conduct w[ill] continue into the future. Actions speak louder than words.").

At trial, DFPS investigator Whitley expressed concern about mother's ability to protect B.A., especially given that she had been allowing Thomas to care for B.A. for a year and she had seen Thomas hit B.A. on multiple occasions. Mother's FSP also noted a concern about mother's "ability to protect [B.A.] from future abuse or neglect" and her ability to keep B.A. away "from people who may inflict serious harm" on the young and vulnerable child. Mother lacked a support system "to help her safely care for the child."

Additionally, mother's psychosocial assessment, a copy of which was admitted into evidence, noted that mother had stated that she did not know how B.A. had sustained the injuries that were observed on him at the hospital and that she did not "want to accuse anyone." Yet mother had acknowledged, during her interview for the psychosocial assessment, that she had seen Thomas spank B.A. Notably, the assessment expressed concerns with mother's "ability to provide safety and protection for her young and vulnerable child" because, although mother reported that she ended her relationship with Thomas after B.A. was injured, she "d[id] not believe he [had] physically abused [B.A.]." According to mother's psychosocial assessment, she needed to confront "[h]er role and responsibility in the current DFPS

case," "her denial about [B.A.'s] injuries," "how she and [B.A.] ha[d] been affected by her lack of judgment about partner choices," "[h]ow to use good judgment about future partner choices," and how to determine "healthy versus unhealthy relationships." At the time of trial, mother had not completed her required parenting classes, her "domestic violence requirements," or individual therapy.

### 3. Current and Future Physical and Emotional Needs, Parental Abilities, Plans for B.A., and Stability of Proposed Placement

#### a. *B.A.'s Specific Needs*

The record shows that B.A. was "developmentally delayed" and had a speech delay. There were concerns about B.A.'s hearing as well. He required speech therapy, occupational therapy, play therapy, and physical therapy, which he participated in twice a week. B.A.'s foster parents ensured that he participated in his required therapies. *See, e.g.*, *In re D.J.G.*, 2018 WL 3513143, at *18–19 (in holding evidence sufficient to support termination of parental rights in child's best interest, noting foster parents were ensuring child participating in necessary therapies).

While living with his foster parents, B.A. also had received medical checkups and visited the dentist; he was also current on his vaccinations. He had been diagnosed with sleep apnea and had his tonsils removed in September 2024 to address his sleep apnea. According to Child Advocates representative Warren, B.A.'s foster parents were adequately addressing B.A.'s medical and therapeutic

43

needs while he was in their care. *See In re M.A.A.*, 2021 WL 1134308, at \*23 (child's basic needs include medical and dental care); *In re A.S.*, No. 02-19-00429-CV, 2020 WL 2071944, at \*7–8 (Tex. App.—Fort Worth Apr. 30, 2020, pet. denied) (mem. op.) (considering, in determining best interest, that child had benefitted while in placement with foster parents because child had been able to access necessary physical therapy on regular basis).

In contrast, mother acknowledged that while B.A. was in her care, he was not current on his vaccinations because she did not have time to get them. He was also not receiving "services for his speech delay" while he lived with mother because she had not been concerned about it. Child Advocates representative Chevalier expressed concern with mother's ability to address B.A.'s medical needs due to her history in failing to care for those needs in the past.

b. *Mother's Living Arrangements*

A child's need for a safe and stable home is the paramount consideration in assessing the best interest of the child. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *Adams v. Tex. Dep't of Fam. &*

44

*Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (in children's best interest to be raised in consistent, stable, and nurturing environment).

Mother agreed at trial that she did not have "stable housing." Instead, she testified that she had been living with her new boyfriend for about five months. She also stated that she planned to move out of her boyfriend's home within the next six months. Mother acknowledged that she was not prepared for B.A. to be immediately returned to her care. *See In re D.S.D.*, No. 01-24-00743-CV, 2025 WL 898322, at *19 (Tex. App.—Houston [1st Dist.] Mar. 25, 2025, pet. denied) (mem. op.) (in determining best interest, noting parent's acknowledgment that "his life was not stable at the time of trial"); *In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (stability of proposed placement important consideration in determining whether termination of parental rights in children's best interest).

c.    *Current Placement*

DFPS caseworker Vidal testified that B.A. had been living with his foster placement for most of the case and his foster parents wanted to adopt him. *See In re T.M.R.*, No. 13-21-00144-CV, 2021 WL 4998438, at *7 (Tex. App.—Corpus Christi–Edinburg Oct. 28, 2021, no pet.) (mem. op.) ("A factfinder may consider the consequences of [the] failure to terminate parental rights and may also consider that

the child's best interest may be served by termination so that adoption may occur."); *In re L.W.*, 2019 WL 1523124, at *23 (in holding evidence sufficient to support trial court's best-interest finding, considering children were placed in adoptive home with foster parents who wanted children to continue living with them).  B.A. was bonded with his foster parents and his foster siblings.  He called his foster parents "Mom" and "Dad."  *See In re J.H.*, 2023 WL 2169952, at *17, *24 (considering in best-interest determination that child referred to his foster parents as "mom" and "dad" (internal quotations omitted)); *In re S.H.*, No. 01-22-00255-CV, 2022 WL 17254956, at *14 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. denied) (mem. op.) ("[A] child's bond with his placement family implies that the child's desires would be fulfilled by adoption by the placement family.").  Vidal described B.A.'s current placement as safe and stable and noted that his foster parents were meeting his needs.  In her opinion, B.A.'s foster parents were attentive to him and showed him affection.  *See In re J.M.*, 156 S.W.3d 696, 708 (Tex. App.—Dallas 2005, no pet.) (holding evidence sufficient to support trial court's finding termination of parental rights in child's best interest where "[t]he evidence show[ed] the foster parents' home [was] stable").

Additionally, Child Advocates representative Warren described B.A.'s current placement as organized and structured.  He participated in kid-appropriate

activities with his foster family. His foster parents were loving and affectionate and paid attention to his needs. They wanted to adopt B.A.

Child Advocates representative Chevalier also noted that B.A. began living with his foster family in July 2023. Beginning in November 2023, B.A. was placed with one of mother's relatives, but when she became unable to care for B.A., he moved back to his foster family. According to Chevalier, when B.A. returned to his current placement, he was excited to be there; "[h]e just kind of resumed where he had left off." And he "verbalized that he was home." B.A. was thriving in his current placement, and he referred to his foster mother as "Mom." Permanency was important for B.A.

The Child Advocates report, a copy of which was admitted into evidence, also indicated that B.A. was thriving in his current placement. He was receiving his required therapies and had begun attending school. He appeared to have adjusted well to his placement, and he had "expressed his desire to be in his current placement." B.A. had three foster siblings with whom he was bonded. He shared a room with his foster brother and had his own bed.[27] *See In re G.J.A.*, No. 13-22-00209-CV, 2022 WL 3092177, at *8 (Tex. App.—Corpus Christi–Edinburg

---

[27] The permanency report, a copy of which was admitted into evidence, stated that B.A. was four years old and enjoyed playing with toy trucks, watching cartoons, playing outside, and being active. He was well-adjusted to living in his foster home. B.A. started pre-kindergarten in August 2024.

47

Aug. 4, 2022, no pet.) (mem. op.) (in holding sufficient evidence to support trial court's finding termination of parental rights in children's best interest, considering evidence showed that children were thriving in current placement, placement was meeting children's needs, children called their foster parents "mom and dad," and children were bonded with foster family (internal quotations omitted)).

### 4. Mother's Acts and Omissions

A parent's failure to comply with her FSP supports a finding that termination of her parental rights is in the best interest of the child. *In re D.S.D.*, 2025 WL 898322, at *22; *see also In re J.-M.A.Y.*, Nos. 01-15-00469-CV, 01-15-00589-CV, 2015 WL 6755595, at *7 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, pet. denied) (mem. op.) ("[A] factfinder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her children that she does not have the ability to motivate herself to seek out available resources needed now or in the future.").

Here, mother's FSP required her to, among other things, maintain stable housing throughout the pendency of the case;[28] maintain legal and verifiable employment;[29] attend and complete parenting classes;[30] complete a domestic

---

[28]  Mother's housing needed to be safe, clean, and free of hazards to ensure B.A.'s well-being.

[29]  It appears that this requirement was met.

[30]  The FSP noted that online parenting classes were not acceptable.

violence assessment and follow its recommendations; complete a substance abuse assessment and follow its recommendations; participate in narcotics-use testing throughout the pendency of the case;[31] complete a psychosocial assessment and follow all recommendations;[32] complete a psychological evaluation to assess her emotional and mental health and follow all recommendations; attend all court hearings, permanency conferences, family visits, and scheduled case-related appointments; and refrain from all criminal activity or interacting with anyone involved in criminal activity.[33]

The record is clear that mother did not complete all the requirements of her FSP. For instance, DFPS caseworker Vidal testified that mother had not established stable housing, completed her required parenting classes, or attended all hearings and visits with B.A. during the case. The permanency report, a copy of which was admitted into evidence, noted that mother had failed to attend a permanency conference, court hearings, and certain visits with B.A.

---

[31]  The FSP informed mother that if she missed a required narcotics-use test, it would be considered a positive test result.

[32]  Mother's psychosocial assessment had recommended that she participate in and complete parenting classes because she could "benefit from learning about effective parenting techniques, how to create structure for her child, along with [providing] appropriate supervision/caregivers for her child." The psychosocial assessment also recommended that mother participate in individual therapy.

[33]  There is no evidence that mother engaged in criminal activity, other than engaging in narcotics use, during the pendency of the case.

The evidence also shows that mother tested positive for narcotics use during the pendency of the case and failed to attend all required narcotics-use testing. Mother acknowledged that she had not completed her individual therapy requirement and that she had been told by DFPS that she had not completed the correct domestic violence and parenting classes. Mother also agreed that she had not complied with the "stable housing" requirement of her FSP, and she admitted that she had missed visits with B.A.[34] *See In re J.H.*, 2023 WL 2169952, at *18 (considering parent either missed visits with child or was late to visits with child in determining whether evidence sufficient to support trial court's best-interest finding); *In re A.L.W.*, No. 01-14-00805-CV, 2015 WL 4262754, at *12 (Tex. App.—Houston [1st Dist.] July 14, 2015, no pet.) (mem. op.) (fact finder could infer from parent's failure to take initiative to complete services required to regain possession of her children that parent did not have ability to motivate herself to seek out available resources needed now or in future).

Thus, although mother engaged in some aspects of her FSP, she did not complete its requirements.[35] *See In re M.L.H.*, No. 04-21-00408-CV, 2022 WL

---

[34] Mother stated that her visits with B.A. were stopped by court order because she had failed to attend certain visits. DFPS caseworker Vidal testified that mother would cancel her visits with B.A. "last minute," and she was acting inconsistent. Vidal thought that mother had visited B.A. five or six times during the entirety of the case.

[35] As to excuses for mother's acts or omissions, we note that mother, in her briefing, references certain extremely traumatic experiences in her life, which she asserts made "things . . . difficult for [her]" and caused her to be "slow to start her services

50

526501, at *4 (Tex. App.—San Antonio Feb. 23, 2022, pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support trial court's best-interest finding where parent "engaged in her service plan, [but] she failed to successfully complete it"); *In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (failure to comply with court-ordered service plan for reunification with the child relevant to best-interest finding); *cf. In re N.J.H.*, 575 S.W.3d 822, 835 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (whether parent complied with FSP was proper consideration in best-interest analysis and parent's compliance with FSP weighed against termination).

For these reasons, viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of B.A. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of B.A. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's parental rights

---

in this case." We are not unsympathetic to the difficulties mother has faced, but the trial court was still entitled to find that mother's acts or omissions weighed in favor of termination of her parental rights. *See In re A.N.*, No. 02-14-00206-CV, 2014 WL 5791573, at *25 (Tex. App.—Fort Worth Nov. 6, 2024, no pet.) (mem. op.).

was in B.A.'s best interest, or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of B.A. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in the best interest of B.A. *See id.*

We overrule mother's third issue.

### Managing Conservatorship

In her fourth issue, mother argues that the trial court erred in appointing DFPS as the sole managing conservator of B.A. because DFPS "failed to introduce sufficient evidence at trial that demonstrated any specific, identifiable behavior[s] on [mother's] part that would significantly impair [B.A.'s] physical health or emotional development" and there was not "any evidence that [mother] engaged in any conduct that endangered" B.A.

The Texas Family Code provides that "[i]f the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, [DFPS], or a licensed child-placing agency as managing conservator of the child."[36]  TEX. FAM. CODE ANN. § 161.207(a); *see also In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at *8

_____

[36]     The parental rights of B.A.'s alleged father were terminated by the trial court.

52

(Tex. App.—Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.) ("When the parents' parental rights have been terminated, [Texas] Family Code section 161.207 governs the appointment of a managing conservator."). Generally, we review a trial court's conservatorship determination for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

Importantly, an order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to her child. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re A.L.J.*, No. 01-19-00251-CV, 2019 WL 4615826, at *9 (Tex. App.—Houston [1st Dist.] Sept. 24, 2019, no pet.) (mem. op.). A parent with no legal rights with respect to her child lacks standing to attack the portion of the trial court's order appointing DFPS as the sole managing conservator of the child. *See In re A.L.J.*, 2019 WL 4615826, at *9.

Here, we have overruled mother's complaint that the trial court erred in terminating her parental rights to B.A. *See In re J.H.*, 2023 WL 2169952, at *27; *see also In re A.L.J.*, 2019 WL 4615826, at *9 ("Once we overrule a parent's challenge to the termination order, the trial court's appointment of [DFPS] as sole managing conservator may be considered a 'consequence of the termination' . . . ."); *In re S.R.*, 452 S.W.3d at 359 n.3 ("A trial court does not abuse its discretion in appointing [DFPS] as conservator of the children where the evidence is sufficient to support termination of parental rights."); *Quiroz v. Dep't of Fam. & Protective*

*Servs.*, No. 01-08-00548-CV, 2009 WL 961935, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.) (refusing to address parent's complaint evidence insufficient to support DFPS's appointment as sole managing conservator where evidence sufficient to support termination of parent's rights). Thus, the trial court's order terminating mother's parental rights divested her of her legal rights and duties to B.A. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re J.H.*, 2023 WL 2169952, at *27; *see also In re A.L.J.*, 2019 WL 4615826, at *9 ("Because we have overruled [parent's] challenge to the portion of the trial court's order terminating her parental rights, the order has divested [her] of her legal rights and duties related to [the children].").

Having no legal rights with respect to B.A., we hold that mother lacks standing to challenge the portion of the trial court's order appointing DFPS as sole managing conservator of B.A. *See In re J.H.*, 2023 WL 2169952, at *27; *In re A.L.J.*, 2019 WL 4615826, at *9.

We overrule mother's fourth issue.

**Conclusion**

We affirm the order of the trial court.

Kristin Guiney
Justice

Panel consists of Justices Guerra, Guiney, and Johnson.